## THE THAMES STEAMBOAT COMPANY *vs.* THE HOUSATONIC RAILROAD COMPANY.

The master is not liable in an action of trespass, for the act of his servant, where such act was neither expressly ordered nor authorized to be done.

Nor is he liable in such action, where the injury was not the natural and probable result of the execution of the master's orders, and could have been avoided by the exercise of ordinary care on the part of the servant.

The principle of law that subjects a master for the tortious act of his servant in the performance of his master's business, within the scope of the general authority, is the same as that which subjects him for the act of his servant, done by his express direction; but the remedy for the injury in the former case is by an action on the case; in the latter, by an action of trespass.

The liability of a master, in an action of trespass for the act of his servant, done by his express direction, does not rest upon the relationship of master and servant, but upon the fact that the act was done by the master's express direction.

In an action of trespass *vi et armis*, it was proved that the plaintiffs' steamboat took fire in the night season, while it was fastened by the plaintiffs' cable to the defendants' wharf, upon which stood an old wooden freight-house; but before endangering said freight-house, and while the fire could have been extinguished, the cable was cut by the defendants' watchman, and the boat drifted away and was burned. No evidence of any authority for the act of the watchman was introduced, other than such as might be implied from the watchman's general employment as such, in the business of the defendants. The court rendered judgment as in case of nonsuit. Held, that such nonsuit was properly granted.

THIS was an action of trespass *vi et armis*.

The declaration charged, substantially, that the plaintiffs, on the 26th day of July, 1852, were the owners of a steamboat, called the *Alice*, which by two cables was secured to a wharf belonging to the defendants; that the defendants, by their servants and agents, with force and arms, cut in two said cables, and threw off the same from said wharf, and thereby wholly destroyed the same, and by reason thereof said steamboat was severed from said wharf, and was, by the current, swept into the harbor beyond the control of the plaintiffs and their servants, who were then extinguishing a

fire, accidentally existing at the time, on board said boat, and was burned up and wholly destroyed.

The defendants pleaded the general issue, with notice of special matter to be given in evidence.

On the trial to the jury, the plaintiffs introduced the following testimony.

1. Levi Wheeler, who testified as follows:

I was one of the watchmen of the city of Bridgeport, and was so employed, at the time of the burning of the steamboat Alice, in July, 1852; when I saw her, smoke was rising from between the wheel-houses; I ran for No. 5 engine, and my associate watchman ran for No. 4. No. 4 got first on the ground; the fire had burned but little, the wind was very light, almost a calm; the air blew off shore, away from the buildings on the wharf where she lay. The engines came down on the wharf close to where the boat lay. In passing along on the side of the depot, I met Lawrence Sheridan, with an axe in his hand, about the middle of the depot; this depot, or freight-shed, was like an farmer's old corn-house, with two openings into it, one at the bow, and the other at the stern of the boat. Sheridan was a watchman for the Housatonic Railroad Company; I had seen him there as a watchman, for a year and a half, or two years, before this time. Some one said to Sheridan, what are you doing with your axe? he replied, I have been cutting the boat loose; to which the man said, you ought not to have done that. Sheridan then said, he had been put here to take care of the property of the road, that he had done it and should do it again. When No. 5 engine got there, which was the second engine on the ground, the fire could have been put out, without much loss, if the boat had continued to lie at the wharf; the two pipes from the two engines would have put it out in a very little while; each engine could have taken a place at a gangway. I believe the property on shore would not have been burned from the boat, had she burned down at the dock. The boat drifted off from the wharf, and burned on the flats

in the harbor. The wheel-house, which lay toward the west, was not burned. After the boat was cut loose from the wharf, and had drifted off, some one spoke as to her being hauled again alongside of the wharf, and Capt. Hawley, who, I understood, was superintendent of the railroad company, said, that she could not be hauled back again. The fire took place between twelve and one o'clock. Sheridan acted as watchman of the defendants for some six months after this time. Captain Hawley also continued in charge of the property of the company, and the wharf, &c. After this,

On cross-examination, he testified : I first heard the alarm of fire ; heard the cry, fire! I could see no fire at the time ; There were two or three standing about, but I knew no one but Cogswell, the watchman; he said the Alice is on fire; the watchman went up Main street, the witness to Water street. The boat lay by the shed; it might have been fifteen or twenty minutes, possibly thirty or thirty-five, before he got to the fire with the engine; engine had a quarter of a mile to go ; engine went to stern of boat; a schooner lay above the stern of the boat; people on board of her; the stern of the boat was fast when he first got there ; could have put out the fire in fifteen minutes, I think.

2. John Cogswell, who testified, that he was in Hall street at the time, and heard a halloo ; that he ran toward the boat and saw it; then ran to No. 4 engine, and gave the alarm ; came down to the boat, and went on board at the after-gangway. The boat soon began to swing off; he ran forward, and when he came back, she was cut loose; there was no difficulty in putting out the fire when he went on board; there was but little fire; that was near the pipe; thought the property on shore was not hazarded by the boat's remaining at the wharf; thought the shed had a tin roof; don't know who cut the boat loose ; saw Sheridan there. The Housatonic Railroad Company were in possession of the property there ; fire broke out between one and three o'clock ; neither end of the

boat was cut loose when we got there; it could not exceed ten minutes from the first alarm, to the time when No. 4 engine got there.

On cross-examination, he said he gave the alarm of fire; he heard a halloo; went on board the boat, and came back to find the foreman of the engine; told some of the men to come back to the stern of the boat; she had swung off so, when they came back, that they could not get on board; then started forward, and found she had been cut loose there also; that, from all he saw, he thought there would have been no difficulty in putting out the fire, if the boat had remained at the wharf; has had experience in engines, having belonged to fire-companies for a number of years formerly; could not have been many minutes between the time of his going forward and finding the boat fast, and then finding her cut loose.

3. The deposition of Elbridge G. Allen, who deposed as follows:

I was engineer on board the Alice, at the time she was burnt, at Bridgeport, on the night following the 21st day of July, 1852. The boat, for some time before she was burnt, had been running between New York and Bridgeport; she reached Bridgeport on the afternoon before she was burnt, at about three o'clock, and by four o'clock, all the fires in my department were out. Between twelve and one, I was aroused by an alarm of fire; I got up immediately, and discovered a blaze of fire coming up by the side of the gallows-frame; there was another blaze coming up through the scuttle-frame, above the vise-bench; took a pitcher of water and threw it on the fire, and it extinguished the blaze that came up by the side of the gallows-frame; I then went back to my room and put my pantaloons on, and then went out again, and sung out to the fireman to bring up the buckets as soon as he could; the blaze was then coming up around the casings of the cylinder. I went back to my room, put some of my clothes in my trunk, and hauled it to the door;

then I went forward, and they had got the buckets and were passing up water on to the forward deck. I took buckets also, and threw water on the fire, which somewhat kept the fire in check. After I had thrown water a few minutes, I went to my room again, and handed my trunk to Thomas Crafts, and he put it ashore. When I got ashore, I found the boat separated or disconnected from the main line, and gradually swinging off, and about that time, one fire engine was brought on to the ground; the fire was then burning around the gallows-frame, and forward around the boiler; it had not got aft; the firemen ran their hose out, but the boat had swung out so far that the hose could not reach it, and some one sung out, put on another butt of hose. About that time the bow of the boat began to go off; the whole boat then swung off bodily; who cut the bow-line, or when it was cut, I do not know. My brother-in-law, Thompson, and another person, went aboard after the boat went off, to run a line ashore, so as to haul her in again, but they did not succeed, and came ashore, and the boat swung around to the edge of the flats. If the lines had not been cut and the boat had been allowed to remain where she was when the fire commenced, I have no doubt that the fire could have been extinguished in a short time, if the fire-engines that were there, were good ones, for water was handy, and there was plenty of it, and the engines, if they were good ones, could have flooded the boat in a very short time. After burning some time, the boat sunk. I think it must have been an hour and a half, or two hours, and perhaps more, after she went on to the flats, before she sunk. When she sunk, both wheel-houses were standing; the larboard one was burnt around the top some, but the outside of the starboard was scarcely burnt at all; the name of the boat was left undefaced, and was plain to be seen on that wheel-house. I do not know how the fire originated, but think it was the work of an incendiary, for there was no combustible matter on board anywhere near where the fire was, and at four

o'clock, there was no fire in that part of the boat under my charge, or near where the fire originated, and the ashes were all wet down. We had no watchman on board that night, because we were up till near twelve o'clock. The hands belonging to the boat worked, getting out and in freight, till after eleven o'clock, and then some of them went ashore. When they returned I can not state, though one of them, whom we called Sandy, was there, and helped me at the fire. The breast-line was cut, and the stern-line thrown off some ten or fifteen minutes before the bow-line was thrown off.

4. Samuel Jones testified, that he was foreman of engine company No. 5, at the time of the fire. Met the engine in the street going to the fire; went down to the steamer; got there with engine, and got the suction-hose on ready to play. The boat drifted off out of reach; got a yawl-boat, and took the hose into the boat, but thought we could not do anything till the boat was brought back to the wharf. Capt. Hawley told Concklin not to bring the line ashore; Concklin then threw it off. The fire was between the wheel-houses, and had made but little progress; the engine would have played in less than three minutes, and could throw fifteen feet from an open butt, two hundred and forty gallons a minute; they could have put out the fire in a very few minutes. There was no danger in going on board, nor to the buildings; we could have protected them. The air was very still. He thought the boat could have been saved, so as to go on her trip the next day.

On cross-examination, he said that he had no interest in this case; that he had a claim against the Alice; that he did not know as to their property. Capt. Weeks was his brother-in-law; saw him at the fire perhaps fifteen minutes after he got there.

5. John Sherman testified, that he was a fireman, and had been so, fifteen years; that he heard the alarm, dressed and ran down to the wharf. The steamer was seventy-five to one hundred feet from the wharf, and if she had remained,

they could have put out the fire, and saved the defendants' property. One of the wheel-houses was standing the next day; think we could have thrown the water directly on the fire, as we had a good supply of help.

6. John M. Concklin, testified, that he also resided at Bridgeport, and had been connected with the boat. Ackee was mate; four deck hands; Paterson and his wife were the cooks.

On cross-examination, he said, that the clerk slept on the upper deck. Capt. Hawley said, there was danger to vessels below, and they let go the line; did not attempt, after Hawley forbade it, to bring her up. We paid wharfage for lying at this place, to the railroad company. Capt. Hawley or his clerks received it.

7. S. D. Baldwin, testified as follows: I saw Lawrence Sheridan with an axe in his hand; there was no flame on the boat in sight; saw Sheridan commence cutting after-line; witness said, don't, for God's sake, cut line, she can be saved. She was loose very soon, and drifted off; fire was in line of the pipe; if boat moored at the wharf, no danger to the depot; the old fabric of shed might have caught; easily put out; top of the wheel-house about level with the top of the shed; the starboard wheel-house did not burn enough to deface the name. I think the engines would have put out the fire in a few moments; light work only was on fire.

On cross-examination, he said that he did not see Sheridan cut more than one line; that he noticed he was there, before the engines came.

8. Andrew E. Joy, testified, that he was a merchant at Bridgeport; was awake when first alarm was given; there were few persons standing at the after-gangway. He went on board, and the fire was in the center of the boat. He heard Capt. Baldwin call for an axe, and saw a man come from the other direction, who said he should cut her loose. He saw him cut the bow-line; he was an Irishman; another Irishman came up and said, you are the rascal who cut her

loose.　He thought it was the same man that cut the line forward, Larry Sheridan.　There were high words.　He thought that the engines would have put her out soon; was very little air, and that off shore.

On cross-examination, he said, that he went to the bow of the boat, first; that he did not go to the stern till afterward. He protested against cutting the boat adrift, as he thought that there was no danger.

The plaintiffs proved the due organization of the defendants, and also introduced much testimony, tending to prove that the fire could have been extinguished in a short time, by the fire-engines, which arrived upon the wharf before, or soon after, the cables were severed; and that the buildings of the defendants could have been protected.

The plaintiffs having concluded their testimony, the defendants moved for a judgment, as in case of nonsuit, which motion was granted by the court.　The plaintiffs thereupon filed a motion to set aside said nonsuit, which the court refused to grant, and thereupon they moved that the evidence offered by them, be certified by the court, and the case transmitted to this court for revision.

*Foster*, *Wait*, and *E. Perkins*, in support of the motion.

1.　The plaintiffs' boat was rightfully moored to the wharf and property of defendants, and they had a right to retain her there, when on fire, so long as there was a reasonable hope of extinguishing the fire, or until the property of the railroad company should be seriously endangered by her remaining longer.

2.　The railroad company would be justified in cutting the boat adrift whenever there was no longer a reasonable hope of saving the boat, and their own property had become seriously endangered, and if, in the exercise of this right, they are guilty of unreasonable and reckless negligence, and cut the boat adrift, without just cause, whereby she is lost

and destroyed, they are liable to the plaintiffs for such damage.

3. On the facts proved, the boat would have been saved, if she had been permitted to remain at the wharf, and she could have remained there, without any serious danger to the defendant's property.

4. It is equally clear, on the evidence, that the loss of property was caused by the acts of an agent and representative of the defendants, then, and for a long time before and since, in their employment, and claiming to be acting in their behalf, and by their directions, in this very matter. He was employed as a " watchman," to guard and protect the property of the defendants, alongside of which this boat lay, and to which it was attached.

5. The defendants are answerable for the acts of their agent in this matter, who was placed there for the purpose of exercising his discretion, care and skill in protecting the defendants' property, in just such an emergency as occurred, connected with the boat. In the *bona fide* exercise of this discretion, he is, to all intents and purposes, the railroad company, and his acts are their acts.

6. The defendants are liable in this form of action. The injury was direct and immediate. If he had owned this property, and had done the acts complained of, in his own behalf, could there be any question that trespass would be the proper remedy?

If the corporation is liable at all, it must be in the same form of action, and on the same principles that the watchman would be.

*Hawley* and *M' Curdy*, for the defendants.

I. The defendants are not liable for the conduct of Sheridan, the watchman, in any form of action. He was not their agent, for the purpose in question. 1. They did not direct the act. 2. They did not ratify it, and their neglecting to dismiss him did not ratify it. 3. The act was not

necessary in the performance of his duty. 4. No authority to do the act is implied either in law, or in fact, from the term "watchman." Smith's Law of Master and Servant, 72 Law Library, 144–193. 25 Eng. Com. Law, 175. 38 Eng. Com. Law, 261. 1 American Leading Cases, 465, 640, (or 2 N. H., 548.) 17 Mass. R., 509. 5 Wheaton, 326. 1 Met. R., 560. 2 Conn. R., 479. 1 B. Munroe, 96. 20 Conn. R., 284. 22 Conn. R., 1, 502, 530.

II. If the defendants are liable at all, it is not in this form of action. 72 Law Library, 144.

III. A nonsuit was the proper mode of disposing of the case. 1. The facts, being undisputed, the authority of the watchman was a question of law. 9 Shep., 254. 9 Gill, 331. 2. If it was a question of fact, the evidence was insufficient to sustain a verdict, and justified a nonsuit. 1 Sanford, Sup. Ct., 601. 3 M'Cord, 130. 2 Wend., 424–436. 3 Barbour, 360. 7 Hill, 529. 8 Mass. R., 336. 17 Mass. R., 1. Stat. of Conn.

HINMAN, J. The plaintiffs, in this case, having closed their evidence, the defendants moved for judgment as in case of nonsuit; and the superior court, being of opinion that the plaintiffs had failed to make out a *prima facie* case, granted the motion; and the case is now brought before us for revision, under § 2 of the statute of 1852. Comp. statutes of 1854, p. 97. The question here is the same as in the superior court. Is the plaintiffs' evidence sufficient, in point of law, to make out a *prima facie* case in their favor?

From the evidence, it appears that the plaintiffs' steamboat, called the Alice, in July, 1852, was moored alongside of the defendants' wharf in Bridgeport, upon which the defendants had what the witnesses call a depot, or freight-shed, an old wooden shed, described as similar to a farmer's cornhouse. The boat was fastened to the wharf by means of cables, and on the night of the 21st of July, the boat took

fire, between the wheel-houses, near the smoke-pipe, and before the fire had so far progressed as to endanger the building upon the wharf, and while she was in such a condition that the witnesses supposed the fire could easily be extinguished by the engines just then arrived, or arriving, at the spot, she was cut loose from the wharf by the defendants' watchman, Lawrence Sheridan, and drifted out upon the flats, and was consumed and destroyed. After the boat had drifted away from the wharf, Capt. Hawley, also in the defendants' employment, as superintendent, on hearing it proposed to haul her alongside of the wharf again, said that she could not be hauled back again.

The action is trespass, *vi et armis,* for causing, by means of the defendants' servants, the cables, by which the boat was fastened to the wharf, to be cut; by means of which the boat drifted away from the wharf, and thereby prevented the plaintiffs' servants from extinguishing the fire, and thus saving the boat. It does not appear what Sheridan's duty as watchman was. Nor does it appear that the defendants had any property to be watched at the place, except the wooden shed, which was upon their wharf. It is insisted, however, by the plaintiffs, that, as watchman, he had an unlimited discretion, to do everything that he might think necessary, in order to secure the plaintiffs' property from injury, in any emergency like the one in question; and that as he exercised this discretion in an unreasonable manner, by cutting the boat loose, when there was a reasonable probability that she might have been saved, and especially, when there was no reasonable ground to apprehend danger to the defendants' property, from her burning at the wharf, the wind at the time being in a direction to drive the fire from the wharf, and the building that was upon it, the defendants are liable, and in this form of action, for his acts.

The view which we have taken of the case, renders it unnecessary for us to determine the extent of the watchman's discretionary power, and we therefore do not wish to be con-

sidered as expressing any opinion upon it, any farther than it is involved in the question which we do feel called upon to decide, in order to determine whether there was any error in the court's granting the nonsuit. To hold, however, that his discretion was unlimited, as claimed by the plaintiffs; that he had power to do whatever he might think best, even to the destruction of the property of third persons, and without any reference to its comparative value to the property he was set to watch, is such a startling proposition that we can not for a moment sanction it.

If such a proposition could be sustained, then, indeed, the defendants might be liable in trespass for this injury, because to employ an agent, with such unlimited powers, might be tantamount to an express direction to the watchman, to cut the boat loose, given at or before the time when the act was done. The question, it is to be observed, is confined to the powers the law will imply, or infer to have been given to this agent, because there was no proof of any other powers having been given him, in point of fact. The books tell us that general agents must exercise a sound discretion, but precisely what this consists in, they do not inform us. It appears to us, that it is more correct to say, that the law will imply, in favor of agents, whether the agency is limited to one or more objects, the usual and appropriate means to accomplish the object, or objects of the agency. There must be some discretionary power in every agency, where the manner in which it is to be conducted is not specifically pointed out by precise and definite instructions, given before it commences, or has not become settled by known rules of law; and wherever there is any discretionary power, whether it is general or limited in its nature, it would seem that it ought to be exercised soundly. An unlimited discretion would give the watchman power to pull down, or blow up, with any means at his command, any buildings contiguous to a fire, which he might think, to some extent, endangered the property he was set to watch. If such powers were in fact given to a

watchman, we do not see why the master should not be liable for its exercise.  But a power so liable to be abused, and when abused, attended with such consequences, no prudent man would entrust to an agent of this description.  And will the law, by implication, confer a power which no prudent man would entrust to his agent?  All powers are to be construed with reference to the subject-matter, which, in this instance, was to keep watch.  As incident to the discharge of this duty, the watchman might have power to extinguish fires, and, in some instances, to remove combustible materials from the vicinity of the property watched, when it could be done without injury to others.  But, at best, the power to remove the boat from the vicinity of the property watched, was only incidental, and, on general principles, ought not to be so construed as to empower the watchman to ruin his employers, by destroying her, without reference to the comparative value of the property watched, and the property destroyed.

The law is rather jealous of the exercise of unlimited powers of discretion, in subordinate agents and servants.  In some cases, where the master is not at hand to be consulted, as is sometimes the case of the master of a vessel, in a foreign port, it will give very enlarged powers to an agent, but this is from the necessity of the case.  Here it does not appear, we are aware, that the principal officers of the defendants' company resided in Bridgeport; and that the company kept its office there; but the corporation is entirely within the state, and the principal terminus of the road is at Bridgeport, and it may fairly be presumed that there were officers there of a higher grade than that of night-watchman to one of their sheds; and if there was no one there, who could be consulted in such an emergency as this, we think, at least, it ought to be shown, before it is assumed, that it falls within the general powers of this subordinate agent, for a special purpose, to destroy a valuable vessel and cargo, in order to save property of very trifling importance, comparatively.

The law will not presume that a principal, for any purpose, would authorize an agent to take and convert property to his own use, that did not belong to him ; and if it will not confer this power on an agent, we see no more reason for its conferring on him a power to destroy, than to take property ; and we certainly should require some direct and controlling authority, before we should feel authorized to hold that where the principal's property is to some extent threatened by a contiguous fire, though, in this case, it does not appear to have been even threatened to any considerable extent, that the agent has power to remove the property which threatened it out of the way, and by such removal, destroy it. No such authority has been produced, and we presume, therefore, none such can be. But however this may be, we are satisfied that the plaintiffs can not recover in this case, even assuming the authority of the watchman, as the agent of the defendants, to cut the vessel loose, on the ground that it endangered the property he was employed to watch, to be unquestionable.

The principle that subjects a master for the tortious act of the servant, done in the performance of the master's business, and within the scope of the general authority conferred, is the same as that which subjects him for the act of his servant, done by his express direction, given at the time. In both cases the maxim applies, *qui facit per alium facit per se*, and the master shall be responsible for the acts of his agent, to the same extent that he would be, if he personally committed the wrong. But the remedies, applicable to these several injuries, are entirely different. In the former case he is liable only in an action upon the case, founded upon the negligence of the servant in the performance of the master's lawful business. Whereas, in the latter case, he is liable in an action of trespass, caused by the act of the servant. But his liability to be sued in trespass does not rest at all upon the relationship of master and servant which exists, but upon the fact that the act complained of was done by his express

direction and command; and so, in reality, as well as in law, is his own act, though done through the instrumentality of another. A man shall not be made a trespasser against his will, though he may be made liable in an action on the case for the negligence of the servant, while engaged in the business of the master, however contrary to the master's wishes such negligence may be; and the reason is, because he, who is damaged, ought to be recompensed; and a man must so use his own, as to do no injury to another; and where one of two innocent persons must suffer, it is more reasonable that he should suffer whose act of employing an unskilful, or negligent servant, was the cause of the injury, than that the other, who has been wholly in the right, should be compelled to bear a loss, brought upon him through another's want of care, in not attending to his own business, and in entrusting it to the carelessness of his servant.

The law never imputes malice, or a wanton and wilful trespass, to the transaction of any lawful business, contrary to the wishes of the party, any more than it will impute crime. These acts may be done through the instrumentality of agents; but it must be shown, as a fact, that they were ordered, directed or authorized to be done; the law will never infer this from the mere relation of master and servant. Undoubtedly, this relation may be a circumstance, proper to be shown in connection with other facts, tending to show that the act complained of, was done by the command of the master; but unless the act of trespass is the natural, or necessary, consequence of something which the master has ordered to be done, it will not alone be sufficient to subject the master. The old authorities on this subject were all examined in the leading case of *M'Manus* v. *Crickett*, 1 East, 106, in which it was explicitly held that a master was not liable for the wilful act of his servant. The substance of these old authorities is very well condensed in the opinion of the court, as expressed by Lord Kenyon, in that case. "It is a question," says that learned judge, "of very general con-

The Thames Steamboat Company *v.* Housatonic Railroad Company.

cern, and has been often canvassed, but I hope at last it will be at rest. It is said in Bro. Abr., tit. trespass, pl. 435, ' If my servant, contrary to my will, chase my beasts into the soil of another, I shall not be punished.' And in 2 Roll. Abr., 533, ' If my servant, without my notice, put my beasts into another's land, my servant is the trespasser, and not I, because by the voluntary putting of the beasts there without my assent, he gains a special property for the time, and so for this purpose they are his beasts.' And in Noy's maxims, ch. 44, ' If I command my servant to distrain, and he ride on, the distress, he shall be punished, not I.' And it is laid down by Holt, C. J., in *Middleton* v. *Fowler*, Salk., 282, as a general position, ' that no master is chargeable with the acts of his servant, but when he acts in the execution of the authority given him.' Again, says Lord K., ' This doctrine does not militate with the cases in which a master has been holden for the mischief, arising from the negligence or unskilfulness of the servant, who had no purpose but the execution of the master's orders ; but the form of their actions proves that this action of trespass can not be maintained.' "

The fact that the act of cutting the cables was a direct injury, which would render the watchman liable in trespass, had he been sued, makes no difference. This appears, negatively, from the fact, that no case can be found where an action of trespass has been sustained against a master, for the acts of a servant, where such acts were not expressly ordered or authorized to be done; or where they were not the natural or probable result of something which the servant was ordered to do, which ordinary care in the execution of the master's orders would not guard against; as was the case of *Gregory* v. *Piper*, 17 E. C. L., 454. The distinction between the trespass of the servant, and the liability of the master for negligence, arising from an act which might amount to a trespass in the servant, is very well illustrated by the case of *Croft and another* v. *Alison*, 6 E. C. L., 528. There, the action was case against the master, for the neg-

ligence of the servant in striking the plaintiff's horses, and the plaintiff recovered. At the time when the horses were struck, the carriage of the plaintiff became entangled with the carriage of the defendant. The chief judge told the jury to find for the defendant, if the entangling was the result of the moving of the plaintiff's horses, which were left without a driver, and the whipping was for the purpose of extricating himself from that situation ; but to find for the plaintiffs, in case the entangling arose from the fault of the defendant's coachman. The court in sustaining this charge, say, if a servant, driving a carriage, in order to effect some purpose of his own, wantonly strike the horse of another person, and produced the accident, the master will not be liable. But if, in order to perform his master's orders, he strikes, but injudiciously, that will be negligent and careless conduct, for which the master will be liable, being an act done in pursuance of the servant's employment.

The English cases on this subject are collected by Smith on master and servant, Law Library Edition, p. 172 and 193, inclusive, where the views which we have here expressed will be found to be fully sustained. Indeed, so long ago as the case of *Morley* v. *Gainsford*, 2 H. Bl., 442, it was said by the court, that it was difficult to put a case where the master would be considered as a trespasser for an act of his servant, which was not done at his command.

And we find nothing in our own reports, or in the reports of any of the states, which at all militates against the English cases. *Wright* v. *Wilcox*, 19 W., 343. *Richmond Turnpike Co.* v. *Vanderbilt*, 1 Hill, 480. *Wilson* v. *Peverly*, 2 N. H., 548. *Vanderbilt* v. *Richmond Turnpike Co.*, 2 Comstock, 479. *Church* v. *Mansfield*, 20 Conn. R., 284.

As, therefore, there was no proof that the defendants ordered or directed their watchman to cut the cables of the plaintiff's vessel; and as this act was not a necessary, or natural, or probable result of anything that he was ordered to do, even in the emergency, as he considered it, when he

did cut it, it appears to us that the defendants can not be made liable in trespass for this act; and the nonsuit was consequently correctly ordered. There was a question of evidence made on the trial, whether the declarations of Hawley, the defendants' superintendent, were admissible, under the circumstances; but the result to which we have come, makes it unnecessary to consider that question, and we do not therefore intend to decide it. There is no error in the judgment complained of.

In this opinion, the other judges, WAITE and ~~HINMAN~~ concurred.

Judgment affirmed.